24-1703 Western Arkansas, United States v. John Nock 24-1713 Western Arkansas, United States v. Brian Britzen and 24-1714 Western Arkansas, United States v. Kevin Griffith All right, we'll hear first from Mr. Johnson on behalf of Mr. Nock. You may proceed. Thank you. Good morning, your honors. My name is Doug Johnson. I'm here on behalf of the appellant John Nock. This case presents a few interrelated issues. I'd like to address our position that the magistrate abused her discretion when she denied Mr. Nock's motion to appoint new counsel prior to the trial. I believe at that hearing it was shown that Mr. Nock was not being adequately represented. He was not simply trying to delay the case. He was not simply unhappy because he found himself under indictment. He was not being represented and I think we can see that by what his attorney represented at the hearing. He said, basically, I haven't looked at everything. I'm not going to dissect everything the has given me. I can't get ready for this case in December of 2022 when Mr. Nock wanted to. I'm going to wait until they pare down their case. And that means he's going to miss some of the documents. He's basically saying I'm not going to look at things that I think we can infer would have helped Mr. Nock. Emails that perhaps showed an understanding by these investors what they were getting into, etc. Not only that, counsel said Mr. Nock said he told me to sit tight and not talk to anyone. And counsel didn't say that's not true. So Mr. Nock is sitting tight, not talking to anyone. And that could sound like good advice, don't talk to anyone, but I submit to you this attorney and this client needed to work together. This was a sophisticated, the government alleged this is a very sophisticated scheme. It involved international finance. The counsel was an attorney, but he had no special understanding of international finance or alleged fraud. They needed to work together and look at those documents. And counsel basically said I'm waiting. But he said there's one thing I do know. It's a straightforward credibility case. A, how could he know that? He hadn't looked at everything. B, what does that mean? Every case is credibility at some point. But I submit to you this wasn't a straightforward credibility case and that should have been known early on. It was a case where the defendants had to rely on the wording of those contracts, strategic agreements, know your client, those types of documents. And not all of them got into the record. Some of them did. But I think we can infer that there was he wasn't, hadn't looked at yet. He's going to wait until they pare it down and then get ready for this type of trial in less than six weeks. And the judge simply said, said more, but basically said there's a lot of work to do. I can see that. So yeah, there is a lot of work to do. We can agree on that. And then she said Mr. Osborne is canny. So she's basing her opinion somewhat, I believe, on what she knows about his performance in other cases. But what we should look at is what he did in this case, which is he made admissions that he had done nothing. And if we look at what happened, it corroborates that he was not prepared. He didn't do pretrial motions. He didn't respond in writing. Very few objections. Superficial crosses. He didn't even move for a directed verdict. How hard is that? So there he's waiting a sufficiency argument for later. I submit to you, why not move for a directed verdict because you've thrown in the towel? I can see no other reason. And then in his closing arguments at the trial, he said, well, look at the agreements. You have them. And as you saw by the exhibits of this case, there are thousands upon thousands of documents. Not only did they not have all the agreements because he didn't introduce them, but they had some and he didn't highlight the wording that would have helped, I submit to you, the defendants, that these investments were based on best efforts. The actual language, we were not solicited, the investors. The representations that the Brittingham Group was not the trader, they were the liaison and they were not to be held liable for representations of the third parties. None of that was pointed out. And then the trial, when all was said and done, and the judge did decide, the magistrate did decide to appoint new counsel, counsel said, Mr. Osborne said, yeah, we're past the time for a post-trial motion. I didn't see anything with merit. And he also, then the judge said, and by the way, would you like to turn over your file? I'm sure you have a very large file. And he said, no, I don't. I just have what the government gave me. No practice crosses, no closing arguments, no interview notes, nothing. There was basically nothing done here. And I submit to you that supports our other arguments of ineffective assistance of counsel and that the motion should have been granted. And I want to now address... Was the motion, the denial of the motion for a new trial, was that appealed to the district court? It was not, Your Honor. And I submit that it should, in the interests of justice, that that should not bar this argument now, that it was not waived. There is no way Mr. Nock, he did everything he could or he knew about, he certainly wouldn't have known. His attorney wanted to stay on the case. That was clear from the hearing. So he's not going to tell him, here's what you should do if you want me off the case. In the interests of justice, I submit that this argument should be addressed on the merits. And then I did want to make comments about Agent Nance because I think it has to do with the argument, this issue, and also the other issue in our brief about him. Agent Nance came in and took over this case. This FBI agent came in and counsel just let him steamroll. Nance sat at the table, and I know that's allowed, but he testified at length twice and he put a narrative gloss on the government's case. He came in and he said, these investors are victims. These, Tajakma, Goldberg, and the other are co-conspirators to Britson, Griffith, Ituma, and Nock, they're conspirators. He's labeling them all these things and he was a lay witness and counsel just sat there and let this continue on and on. And the government will make its argument, but Nance's, our position is that Nance's testimony was so improper, providing this narrative gloss, interpreting emails, not just reading them, but saying, oh, this is an example of the Brittingham group lulling these investors. Oh, Wistenson, what did he say? Oh, he said that he relied on the Royal Bank of Scotland letter to invest. I point that one out because it's simply not true. Nance repeated testimony and in that instance, it wasn't true. Yet, his testimony was not admissible. This is just like people's. He did not base his testimony on his perceptions. He did not base his testimony on what he observed. He based it on his after the fact investigation and he offered opinions that went far beyond 701 and should have been barred. The government cites in their brief, well, okay, there's people's, but there's Dirk's. Dirk's, when there's a split in precedent, this court can go with the Dirk's precedent. In Dirk's, the court said the agent's testimony may have been error. This court said it may have been error, but in any event, it was harmless. This case is like people's, not Dirk's. I see my time is up. Thank you. All right. Thank you for your argument. I understand Mr. Holt will speak next. You may proceed. You're here on behalf of Mr. Griffith. Yes, your honor. Very well. Thank you. Good morning, your honors. May it please the court. I am Aaron Holt and I represent appellant Kevin Griffith. At issue in this case with regard to Mr. Griffith's involvement is whether the evidence showed that he had knowledge of the existence of a fraudulent scheme and that he voluntarily chose to participate in it. Although this court does have to view the evidence introduced at trial in the light most favorable to the jury's verdict, that does not mean the court must view the evidence out of context. As Mr. Griffith pointed out in his briefing, there was no direct evidence of a conspiracy here. There were no emails between the alleged co-conspirators or phone conversations between them directly discussing plans to defraud anyone or discussing how they were going to split up the investor's money that they swindled them out of or anything of that sort. The government has not really disputed that assertion. They've just pointed out two evidence that really can only be considered damning as to Mr. Griffith when it's viewed outside of the surrounding context. According to the government's theory, this case involved a group of fraudsters who conspired together to swindle investors out of tens of millions of dollars by promising huge returns on investments that never existed in the first place. The government never really attempts to explain the numerous communications between Mr. Griffith, who is an alleged co-conspirator, more of a small participant in these investments, and Mr. Nock, who is the alleged ringleader, that are simply incompatible with the existence of the conspiracy that it alleges. Mr. Griffith contends that these communications are among the best evidence available regarding the elements of intent and his knowledge as to whether there was a conspiracy. For example, the government introduced emails from Mr. Griffith, who supposedly joined this conspiracy back in 2013, supposedly knew that none of these investments were legitimate. The emails he sent to Mr. Nock in 2017 expressing concern that Stanley Goldberg, who is one of the overseas counterparties to which millions of investors' money were sent, Mr. Griffith is expressing concern about Mr. Goldberg. He appears to be lying about this transaction. He might be trying to rip off his friend and associate, Nikola Boussaka. Mr. Griffith said, I can't with any integrity suggest that Boussaka used any asset tied in any way to Stanley Goldberg's representations, or his relationships, or his sources of funding. According to the government, again, this is a co-conspirator telling the ringleader of this purported scheme that he was afraid that this other person who was apparently in the scheme with him was lying about something. According to the government's theory, they both knew it was all a sham. This is an email just between these two people, these two alleged co-conspirators. He's supposed to know they're trying to scam Boussaka out of his money. Again, that just doesn't make sense. The government's theory is not compatible with the substance of these communications. There were other communications between Nock and Griffith expressing skepticism and concern regarding representations made by Robbie Roche, the source of most of the Royal Bank of Scotland documents that turned out to be fake. Mr. Griffith's argument on appeal is largely factual, but there is one key principle to note from the case of direct sales versus the United States, which was cited in Mr. Griffith's initial brief, that talks about to establish the intent necessary to show a conspiracy, the evidence of knowledge must be clear, not equivocal, because charges of conspiracy are not to be made out by piling inference upon inference. Mr. Griffith asserts there's no way a reasonable jury could have found him to be guilty of conspiracy without such an impermissible stacking of inferences. Did the government present any evidence that your client was involved in making the representations to the investors of the sort of outlandish returns that were being promised? And in the same vein, any evidence that he was involved in using the false documents to lull these investors into waiting? Yes, Your Honor, the government did not present any evidence of Mr. Griffith making outlandish representations to investors, really, because he did not communicate with the Bredingham Group investors. That was not, you know, he wasn't in that, not Mr. Britson were the ones who communicated with the investors. The only involvement that Mr. Griffith had with the Royal Bank of Scotland documents, again, he had involvement earlier in like 2013 with Mr. Nock. They were going back and forth with Ravi Rosh and being sent these documents. They were trying to do some kind of a currency exchange that inherently relied on the verification that those funds existed so that they could invest those. It wasn't an attempt to get any money from anyone. And as far as, you know, to lull or anything, the only Royal Bank of Scotland documents Mr. Griffith was involved in sending to anybody was he sent some to Mr. Modulo, Willa Modulo, who was, Agent Nance said, this guy's not a victim. He's an associate of the Bredingham Group. They were pitching investments back and forth. He didn't go so far as to call him a co-conspirator, an unindicted co-conspirator. He was not a victim. And then he sent a document to Wendy Smidova, who was one of Mr. Griffith's own partners and a group of Chinese associates called the Millennium Group. There was no indication that she was a victim. The government never talked to her, never interviewed her. And then he sent a document to Elisa Smith, who was another associate of Mr. Griffith's. There was no connection made to the Bredingham Group, no evidence as to who she actually was. The only evidence was she was somebody who he was working with to try to do some kind of an investment himself. So if that's, Judge, if that's answered your question, I'll reserve the remainder of my time. Very well. Thank you for your argument. Mr. Pierce, the court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act, and you may proceed. Thank you, Your Honor. I am Charles Pierce. I'm here to represent Co-Defendant Brian Britzen. I'm going to piggyback on Mr. Holt there a little bit because our argument is similar in that we don't believe that the evidence presented by the government is enough to support their burden of proof to show that Britzen was guilty beyond a reasonable doubt. Hansen, the Hansen case tells us that while a scheme itself can serve as evidence of a defendant's intent to defraud, here Britzen had no knowledge of the scheme. And what I mean there is the background financial investments that were happening internationally. Britzen did not voluntarily or intentionally join the conspiracy with knowledge of its purpose. He firmly believed that he was hoping that one of these investments would hit and that he would make money. He was working a separate job during this whole transaction. He made as little as $91,000 over an eight-year period. And that money was specifically included in the investment agreements that were referenced earlier. And I'm specifically referencing Government's Exhibit 434 and Government's Exhibit 147. All the funds paid to Britzen were allocated as expenses including payroll in those investment agreements. So as far as Britzen was concerned, he had no knowledge of a scheme. Britzen also did not have any access to any bank accounts where the client's funds were deposited. Now he was an individual who emailed and spoke with clients and essentially played a customer service role. But his testimony at trial was that what he would do is he would talk to NOC back and forth and NOC would tell him what the situation was in the international funds because Britzen had no knowledge of what was there. And then he would take what he was told and turn around and try to service the clients. But that limits his role to an extent because he didn't have any access to those accounts and had no knowledge of where the investments were or where they were being invested. One of the alleged victims is a gentleman named Nevada Luther. He was a former Banking Vice President and he was confident in the investment potential of these cases which goes to show you that the clients were sophisticated investors, knew what they were getting into and Britzen was trying to facilitate that. I see my time is gone so I'll reserve it for rebuttal. Thank you. Very well. Thank you for your argument. Mr. Handel, we'll hear from you. Good morning, your honors. May it please the court, Josh Handel for the United States. Unless the court prefers otherwise, I'll take my friend's arguments in reverse order. So we'll start with sufficiency of the evidence. And when we're looking at the trial evidence, I think first and foremost, it's important to remember that there were a number of undisputed facts in this case, including that none of the investors with the Birmingham Group realized any return on their investment and almost all of them lost all of the money that they handed over to the Birmingham Group. That the Birmingham Group never completed a single legitimate transaction and that the Birmingham Group sent investors numerous flagrantly falsified fictitious documents reflecting fictitious bank accounts that I take it my friends or at least some subset of them have acknowledged here today. Now, looking at the evidence individually as to each of the defendants, certainly our theory of the case was that these defendants played different roles in the conspiracy. Mr. Nock was, as the district court found, the ringleader. He was the mastermind behind this. Mr. Britson was the, quote, marketing guy who handled the client. Before you get into the individuals, you just said there were no legitimate investments at all. Did the government trace the money and where did all the money go? We did our best to trace the money. I believe Agent Nance testified to that and he had an extremely difficult time tracing this money to its final resting place, mostly because it was routed through a number of foreign bank accounts over which we do not have subpoena power and it's very difficult to figure out where this ended up. I'm certainly not up here representing that every dime of this $18 million in change ended up in the pockets of the defendants. I think the trial evidence is consistent with there being additional co-conspirators, including co-conspirators who were outside of the United States and may have for something like this, it's very difficult to find the final resting place of every dollar of investor money. We did have testimony, including evidence from, I believe it was Mr. Britson's deposition, a civil deposition, where he acknowledged that the Birmingham group never completed a single transaction. That isn't just me up here vouching for that or even Agent Nance testifying to it. It's an admission from after the end of the conspiracy that this group never actually accomplished what it purported to set out to do. Getting back to the differential roles that the defendants played, as I mentioned, Mr. Britson was the marketing guy. He had a lot of client introductions, a lot of client interactions. Mr. Griffith was less client-facing. He managed the Birmingham group's shell companies. He was more involved on the international side of things. To be candid, we're not exactly sure what all of them did in furtherance of the conspiracy because as most criminal conspiracies operate, there wasn't total transparency in terms of how they were moving around money and who all of the players were internationally. But I think in terms of getting to your colloquy with my friend on the other side about whether there was any evidence that Mr. Griffith personally made some of these outlandish representations about being able to double or triple investors' capital within a week or two, we have less of that from Mr. Griffith than we have for Mr. Nock and Mr. Britson. Mr. Nock and Mr. Britson were frequently emailing directly with clients. We have the jury received testimony from investor victims that Mr. Britson had— By less, do you have any with respect to Mr. Griffith? We do, yes. Yes, Your Honor. This is discussed at page 19 of our brief. It's an email or a series of emails from Mr. Griffith to a prospective investor vouching for the security of this investment based on an attached statement reflecting a 100 million euro balance in a fictitious Royal Bank of Scotland account. So as I mentioned, that's on page 19 of our brief. Which defendant? This is Mr. Griffith. Okay, I thought you were talking about Britson. No, I'm sorry. I'm probably not signposting very well. That was for Mr. Griffith. I don't know what you mean by signposting, but I'm just wondering who you're talking about. Yes, that was Mr. Griffith. I'm happy to go back and talk about the evidence against Mr. Britson, which was extensive. But for Mr. Griffith, in response to Your Honor's question, we do have that email where he's passing along a falsified statement from RBS. And it is not to one of the investors who later testified, but I think the content of the email clearly indicates that it is oriented toward assuaging an investor's concerns. I mean, he says right in the email that this supposed 100 million euro balance at RBS, quote, offers full protection for your investment and, quote, should make this investment completely secure with no risk and only upside. That's at Government Exhibit 162. It was proven that that document was false, was forgery. Yes, Your Honor. Yes. And in fact, we have testimony from an analyst with RBS's parent company that all of the RBS documents that he reviewed in this case were falsified. I'm happy to go back and talk about Mr. Britson. There, the jury received testimony from investor victims that Mr. Britson had pitched them directly on some of these get quick schemes. And that testimony was corroborated by emails that were reduced for the jury. That's discussed at pages 18 and 19 of our brief. We then have Mr. Britson's later admissions in a civil deposition that the Birmingham Group had no returns for investors or completed transactions. That's discussed at page 20. And we have Mr. Britson's direct transmission of fake falsified RBS letters to mollify investors. That's discussed at Government Brief page 22. The last thing that I'll say on this, in addition to quite a bit of documentary and testimonial evidence that was adduced for the jury, each of the defendants testified in his own defense in this case and denied knowledge of or complicity in the fraud. And their denials were plainly disbelieved by the jury. And that is the kind of credibility determination that we canonically vest in juries. And that this court has said in the Aldridge decision that we cite at page 21 of our brief is virtually impossible to second guess on a cold appellate record. So I think between the jury's credibility determinations, the ample witness testimony, the robust documentary evidence, there was plenty to pass the, as your honors know, the very low sufficiency of the evidence threshold. What do you mean by low? That is proof beyond reasonable doubt. Sure. That's absolutely right. I mean on appellate review of a jury's verdict. When the Court of Appeals is asking what we require in the trial record in order to displace the judgment of 12 jurors, I think the showing that the government has to make at that point is just that any reasonable juror could have convicted. I think here we have the type of evidence on which virtually every reasonable juror would have convicted. I'm happy to answer further questions about sufficiency. I can turn to the substitution of counsel and ineffective assistance issue. So we do think that Mr. Nock waived this claim by not appealing the magistrate judge's determination to the district court. I'm not going to die on that hill because I think if you disagree with me on the merits, you will probably also find that the interests of justice are satisfied here. But just to preserve the argument, we do think that that's an important step to take. And when people, particularly when defendants, are represented by counsel, they do need to actually tee this up for review by the district court. But moving on to the merits... Did the magistrate judge alert the defendant of the requirement to appeal? Usually in a written order it says so at the end, but I thought this was just an oral decision. Is there a written order after? There's both an oral decision and a written order. I don't recall that either of them actually affirmatively notified Mr. Nock that he had the right to appeal to the district court. I do know that in the... Notify him in any way, affirmative or otherwise? No, I don't think there's anything in the record on that. I will say in the oral decision, the magistrate judge does say, you know, I'm making this decision, but it's without prejudice to you coming back if things change and, you know, re-alerting me. Coming back to the magistrate, though. Right. That's a different point. It's different, right. And again, this is not a hill that I'm going to die on because I think... Well, you argued it, so I wanted to understand the basis for the argument. That is totally fair. So, you know, moving along to the merits of this claim, you know, I think my friend on the other side said that Mr. Osborne informed the magistrate judge that he had done nothing as of this June hearing. I just don't think that's consistent at all with the record. It's not consistent with what he said at that hearing. It's also not consistent with Record Document 72, which was Mr. Osborne's response to Mr. Knox's pro se motion for substitution of new counsel. In Record Document 72, Mr. Osborne represented that he had, quote, reviewed an enormous amount of discovery in the subject case, but was waiting to conduct a more granular assessment until the government provided its witness and exhibit list. He also represented that he was actively consulting with the attorneys for Mr. Knox's co-defendants and attempting to reach a coordinated trial strategy, that he had attempted to schedule three appointments with Mr. Knox, all of which Mr. Knox had missed, and that he had never denied Mr. Knox a meeting or a phone call. Now, you're right, or excuse me, my friend on the other side is right that Mr. Osborne did also comment that he had concluded this was a straightforward credibility case. I would point out that Mr. Knox's co-defendants, their counsel apparently reached the same determination, because all three defendants in the district court put forward essentially the same defense, which was an empty chair defense. They did not argue in any significant manner that there was not fraud here, or that investors had not lost their money, or that there were actually legitimate transactions going on, or anything like that. Everyone was putting forward the same argument, which was that there was bad conduct here, but it was by Stanley Goldberg and Fred DiGiacma and Ravi Ratch. I think the fact that Mr. Osborne reached that determination, whether that was a reasonable exercise of his discretion as trial counsel, has to be evaluated in light of the fact that both co-defendants also decided to pursue that same strategy. The last thing that I'll say on this, well, I guess two more quick points. First, the mention in Mr. Knox's briefs about Mr. Osborne apparently not having a case file, I would just point out, as we did in our response brief, that that is not established in the record. So the part of the record that Mr. Knox cites for that proposition is a discussion about how Mr. Osborne is going to transfer discovery he received from the government that was subject to a protective order to Mr. Knox's newly appointed counsel. It does not establish that Mr. Osborne did not have a case file for this trial. Now, I don't know. I have not seen, obviously, I have not seen the case file that Mr. Osborne put together, but I think that is not the kind of determination that this court should reach based on representations in briefs alone. And this is why you typically don't reach ineffective assistance of counsel claims on direct appeal, because they require building a better record specifically about defense counsel's trial strategy decisions than we have here. And just the last thing, the last point that I'll make on this, Mr. Knox's argument, as I understand it, essentially boils down to the idea that he would have had a better chance with the jury if he had pointed out more of the fine print in these contracts that let these guys off the hook if they had just exercised best efforts or something like that. Mr. Knox testified to that. I mean, that was something that Mr. Osborne elicited at length from Mr. Knox during his direct examination in front of the jury. So the jury had that explanation in front of them. And I would submit to the court that it is just not a very compelling trial strategy to go out and tell a bunch of people that you can double or triple their capital in a couple of weeks with zero downside risk because you have a trillion dollars in the bank that you're just waiting for Ben Bernanke to release. And then when you get caught on what you were doing, point to some fine print in the contract. And I think that it was certainly within the wide berth of reasonable trial strategy decisions for Mr. Osborne not to pursue that as the preeminent exculpatory theory here. Just very briefly on the issue of Agent Nance's testimony. So this court's decision in Peoples is not on point here. The issue in Peoples was not that the agent summarized evidence or characterized it or provided some sort of narrative based on the exhibits. It was that the agent in that case offered opinions that were outside the can of lay witnesses and was not qualified to as an expert. And this court said explicitly, law enforcement officers are often qualified as experts to interpret intercepted conversations using street language and the jargon of the illegal drug trade. But what is essentially expert testimony may not be admitted under the guise of lay opinions. Here Mr. Nance did not purport to interpret coded language that would be the can of lay witnesses. To the extent he had a better familiarity with this case, it was based on his percipient awareness and perceptions of the evidence that he had come across. None of that was necessarily, none of that needed to be qualified as expert testimony under Rule 702. He permissibly testified as a lay witness pursuant to 701. And so this case is... What was the purpose of his testimony? Giving a narrative like the defense counsel described today, saying these people were victims, these people were co-conspirators and here's how it worked, that kind of thing? No, your honor. I think that the purpose of his testimony was just to get in a lot of these exhibits. I mean, this was, you know, it was... What do you mean? To lay the foundation? Yeah, to lay the foundation for these emails, for the contract language that had been sent around for various pieces of evidence that came outside of just the substantive counts. And I think that the government is allowed... How could he lay the foundation? What was his... Well, he was the case agent. I mean, he was the one who had reviewed this evidence and who had conducted the investigation. I think it's pretty unremarkable for the government to call a case agent to testify about his investigation and what his investigation has uncovered. And I think that was, even setting aside the exhibits, that was the main purpose of... I understand they do that in the grand jury, but in the trial, don't you typically present the actual evidence that was uncovered, not the agent explaining the investigation? Well, and we did present the evidence that was uncovered and the jury had all of that evidence when it went back to deliberate. I mean, all of this evidence that Agent Nance testified to was put into evidence. There was nothing here where... What was he doing? What was Nance doing? I mean, this was part of the government... I guess you can call it a narrative if you want, but the government is allowed to tell a story with its case. It's allowed to structure its case and bring in both evidence and testimony in such a way that is coherent to a jury that is coming with completely fresh eyes to this scheme and these defendants. And I think that that's all that happened here. Certainly, this is not in the people's box of somebody testifying to an area that requires specialized expertise. I would say it's much closer to Dirk's where you allowed a case agent to summarize and explain evidence obtained during the course of his investigation because that elaboration was within the can of lay witnesses. And I also just want to point out, we're in plain error land here. There was no objection to any of this testimony with the exception of Mr. Griffith objecting to Mr. Nance's use of the word victims. And at that point, the district court intervened and it told the government, you need to be more careful about using that term going forward. And the government was, and there was no further problem on that score. And I think that that just emphasizes the fact that a contemporaneous objection can cure these kinds of issues when it's made in a timely fashion in the trial court. And that was not... The district court could have said, well, I think the defense is right. If you want to tell the story and make a closing argument, that's for counsel, not for a witness. Yes. I mean, if the defense had made that objection, yes. I think that this is an area where we allow a wide berth of discretion to the district court to manage these kinds of testimonial issues. And I think the district court could have, I mean, there's a number of It could have set contours for how Agent Nance would testify. It could have offered curative or limiting instructions if those had been requested. None of that was requested in the district court. I don't think it was an abuse, a plainly prejudicial abuse of its discretion to not sue esponte, offer those revenues that were not requested by the defendants. Unless the court has further questions, we'll rest on our brief and respectfully request that you affirm the Very well. Thank you for your argument. I guess all three of you have reserved a small amount of time for a bubble. I'd ask you to keep to the brief time that's remaining, but we'll hear from each of you. And the clerk will put your respective times on the clock. You may proceed. The, Mr. Dock was not advised to approach the district court. That is anywhere in the record I could not find where he was told to approach the district court to seek new counsel. I did not mean to say that Mr. Osborne said I haven't done anything. I believe that's an inference we can draw from the statements he did make. He was not waiting to do a more granular review. He basically said, I'm not, we can infer, I'm not looking at the documents. They're going to pare their case. I'll look at what they show me then. And there wasn't enough time to look at all of that. There were a few meetings scheduled that Mr. Dock missed. It was over a very short period of time, a few days. That's when his wife was sick. And finally, if we look at what Mr. Osborne said, he said, I never denied a phone call. I never told him not to come, but he never did anything. Thank you. Very well. Thank you for your argument. Mr. Holt, you have 47 seconds. You may proceed. Thank you, Your Honor. Just a couple of very quick points. The government Exhibit 162, Mr. Handel mentioned, that was the one that I referenced to Elisa Smith. We have no idea who Elisa Smith is because the government didn't present any evidence other than we know her name and her email address because there was, that's what we have. We don't have anything suggesting she was actually a potential investor. To contradict what Mr. Griffith said was that she was somebody that he was working with separate from the Brittingham group. And then I'll also point out, there were only three major transactions at issue here. The government made the point about, you know, none of these transactions paid off. Well, there were three big ones. They were getting more money to put into these to try to push them across the finish line. It's not like there were dozens of transactions involved and none of them paid off. We would just ask that the court vacate Mr. Griffith's convictions. Thank you. Very well. Thank you. Mr. Pierce. Two quick things. It wasn't an empty chair defense. It was an empty chairs defense. Nance never talked to Robbie Roche, never talked to Stanley Goldberg, never talked to Fred DiGiacomo, Willa Medullo, Mark Starkey, Elsie Smith, Wenwen Li, Wendy Smidova, Joe Knipp, anyone at the Hong Kong Monetary Authority or the RF Family Trust and he never traveled outside the United States to try to interview anyone as part of his investigation. Secondly, Mr. Griffith, I believe, made $86,500 from this alleged scheme. Mr. Britson made $90,970 from the alleged scheme over a period of, again, eight years. That, to me, would allow a reasonable juror to infer that they had no knowledge of any sort of a scheme and it was layer upon layer of inferences that got us there. Thank you. All right. Thank you for your argument. Thank you to all counsel. The cases are submitted and the court will file a decision in due course. Counsel are excused.